UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

NATHAN G. FOX,

      Plaintiff,

v.                                  Case No. 3:19-cv-1079-MMH-JRK

LACEY BARNETT, et al.,

      Defendants.

_____

## **ORDER OF DISMISSAL**

### I.    **Status**

Plaintiff Nathan Fox, an inmate of the Florida penal system, initiated this action on September 16, 2019,[1] by filing a pro se civil rights complaint under 42 U.S.C. § 1983 (Complaint; Doc. 1). Fox names as defendants Dr. V. Montoya, Lacey Barnett, Megan Perry, O. McKenzie, Warden J. DeBell, Assistant Warden Elizabeth Mallard, Secretary of the Florida Department of Correction Mark Inch, Dr. A. Negron, and Dr. Bassa (collectively Defendants). In the Complaint, Fox alleges Defendants were deliberately indifferent to his

_____

[1] See Houston v. Lack, 487 U.S. 266, 276 (1988) (mailbox rule).

serious medical needs in violation of the Eighth Amendment, violated his right to due process under the Fourteenth Amendment, and also committed state law torts of negligence and medical malpractice. Complaint at 7-16. As relief, Fox requests compensatory damages, the implementation of new procedures and protocols for himself and other similarly situated prisoners, his "medical release" or proper training for prison staff, and a temporary restraining order.[2] Id. at 8. On March 29, 2021, the Court granted Montoya's motion to dismiss and dismissed all claims against him. See Order of Dismissal (Doc. 71). Before the Court are the remaining Defendants' motions to dismiss. See Defendants [Inch, Mallard, and Debell's][3] Motion to Dismiss Plaintiff's Complaint (FDOC Motion; Doc. 41), with exhibits (FDOC Ex.); Defendant Barnett and Perry's[4] Motion to Dismiss Plaintiff's Complaint (Nurses' Motion; Doc. 43); Defendant Ramon A. Bassa's Motion to Dismiss Plaintiff's Complaint (Bassa Motion; Doc. 44); Defendant Negron's Motion to Dismiss Plaintiff's Complaint (Negron Motion; Doc. 62). Fox filed a response, see Plaintiff's Response to Defendant's Motion to Dismiss (Response; Doc. 70), with exhibits (Resp. Ex.). The Motions are ripe for review.

---

[2] The Court denied Fox's request for a temporary restraining order on March 27, 2020. See Doc. 17.

[3] The Court refers to these defendants collectively as the FDOC Defendants.

[4] The Court refers to these defendants collectively as the Nurses.

## II.    Fox's Allegations

Fox, who suffers from hemophilia A, asserts that on November 4, 2017, two inmates stabbed him causing severe bleeding. Complaint at 10. Once in the medical department, Fox explained what occurred and his status as a hemophiliac to Officer Belemy, Captain Rutledge and nurse Moore. Id. Fox asserts that these three "were not familiar with hemophilia or trained to handle [him] in a[n] emergency situation," because they were asking him questions about his medical condition and past treatments and Moore was shocked by the amount of bleeding. Id. Moore took Fox to the emergency room in the back of the medical department and "pulled 6,000 units of [Fox's] factor 8 medication to reach room "temperature] before administration . . . ." Id. Nurse McKenzie arrived and began questioning why Fox was there and why the Factor 8 medication had been removed from the refrigerator. Id. According to Fox, McKenzie ignored Moore's advice that due to the excessive bleeding Fox needed an extra dose of Factor 8. Id. Instead, McKenzie returned the medication to the refrigerator and said he was in charge and that he did not "care if he bleeds out." Id. Fox maintains that Rutledge and Belemy did not support Moore in her plea to give Fox additional Factor 8. Id. at 11.

An hour later, Fox was transported to an off-site hospital, where he was assessed by hospital staff and "sutured before [he] could get any of [his] factor 8 medication." Id. Fox asserts that he returned to Sumter and laid on the

examining table in pain, but McKenzie would not allow nurses to clean or treat him, and eventually he was placed back in confinement. Id. He maintains that it took two or three days before he received proper medical care. Id. According to Fox, DeBell, Negron, and Montoya failed to correct McKenzie's error or provide him with the medical attention he needed. Id.

Fox alleges that on December 16, 2017, he wrote a formal medical grievance, #1712-307-054, concerning his treatment following the stabbing attack and "Negron's reference to FDOC policy that did not meet my severe medical needs." Id. at 12. Fox maintains that Negron stated there is a "FDOC policy requiring the health services department to make/create special emergency procedure[s] and/or treatment for any specific inmates, and there is no such thing as an emergence [sic] dose of my factor 8 medication," and that a nurse needs a verbal or written order to dispense Factor 8 medication over what is already prescribed. Id. Fox asserts that Defendants should have created a policy or procedure authorizing the use of an additional dose of Factor 8 in emergency situations. Id.

On the morning of January 1, 2019, Fox states that he awoke to find his right ankle was swollen and painful, which he believed was indicative of internal bleeding in his ankle. Id. at 13. Upon arrival at the urgent care clinic, the nurses declined to give him Factor 8 medication, despite his swollen ankle and pain and the fact he would have received the medication that day from the

cancer center if it was open. Id. The unnamed nurses and Bassa refused to give him the medication and sent him back to his dormitory. Id. Bassa allegedly told Fox that he would be fine, his issue was an "oncology issue," and he could get his medication "that upcoming [Wednesday] when the Cancer Center would be open again." Id. Fox contends that he was left to limp around in pain until Wednesday. Id.

On May 11, 2019, Fox went to the urgent care clinic because he was experiencing pain, redness, and swelling around a port-o-cath in his left chest where he receives his Factor 8 infusions. Id. at 15. Fox told the staff at the clinic that Barnett and Perry had refused to access his port a few months prior "due to their inability to access" it. Id. He maintains that a specialist at Jacksonville Memorial Hospital, Dr. Montoya, and Dr. Robinson gave their approval to continue to use the port. Id. The urgent care clinic staff ran tests and determined his port was infected and he was put on antibiotics. Id. On May 13, 2019, Fox asked to have his port removed due to Barnett and Perry's decision not to use it and because it was infected. Id. Approximately ten days later, Fox had a conversation with Barnett and Perry during which he asked if they were going to access his port again now that the infection had cleared, and he had gotten approval from Dr. Robinson. Id. They both refused to access the port, with Barnett stating Fox had a lot of veins in his arms to use. Id. On

May 31, 2019, officials answered Fox's request to remove his port by stating that removal would need to be approved by Montoya and Bassa. Id.

On June 7, 2019, Fox had his "chronic" appointment with Montoya. Id. at 14. Fox informed Montoya that Barnett and Perry were not accessing his left chest port and, instead, administering his Factor 8 medicine through his veins, but Montoya ignored this information. Id. at 14-15. According to Fox, Montoya told Fox his Factor 8 levels were low and he was going to increase his medication from 7,500 units to 9,000 units twice a week. Id. at 14. Fox told Montoya that his Factor 8 levels were low because he was a severe hemophiliac, and he also told Montoya that he had not recently had any bleeding incidents since January. Id. Despite this information, Montoya still wanted to increase his Factor 8 medication, even though Fox had warned him about "the life-threatening issues if he continued to increase my medication without any sound medical reasoning toward a person with hemophilia." Id. Fox asserts that he was forced to take his Factor 8 medication on June 14, 2019, which caused a severe headache, upset stomach, dizziness, and other unnamed side effects. Id. After telling the nurses at the cancer center, Barnett and Perry, about these side effects, they told him to refuse his Factor 8 medication if Fox did not like Montoya's treatment plan. Id.

Fox also had a follow-up appointment with Dr. Robinson on July 31, 2019, concerning his head injury following an incident where an inmate hit

him with a lock. Id. at 16. Fox asked if it was okay for Barnett and Perry to access his chest port to administer Factor 8 medication, and he said that it was fine and that Barnett and Perry should contact him "since there seem[ed] to be a problem with the last time he had informed them that it was ok." Id. On July 31, 2019, Fox wrote a formal grievance, #1907-209-121, concerning the delay in removing his port due to Barnett and Perry's refusal to use it, as well as ongoing pain he experienced from getting his Factor 8 infusions through his arms. Id. On August 11, 2019, Fox was transported to Jacksonville Memorial Hospital because his port was exposed through his skin and was infected again, causing him pain. Id. He stayed in the hospital for three days until his port was finally removed. On August 15, 2019, Barnett and Perry asked Fox about what happened on August 11th. Id. After he told them, "they laughed and joked 'that is a way to get it removed' refer[r]ing to [his] port." Id.

According to Fox, Defendants were deliberately indifferent to his severe medical need, provided unsafe conditions, and acted negligently. Id. at 9. As relief, Fox requests the following: 5.5 million dollars in damages for pain and suffering, revision of FDOC policies and procedures regarding treatment for patients with hemophilia, his release from prison, and a temporary restraining order against all Defendants until "court issues are resolved." Id. at 8.

### III.   Motion to Dismiss Standard

In ruling on a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). In addition, all reasonable inferences should be drawn in favor of the plaintiff. See Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010). Nonetheless, the plaintiff must still meet some minimal pleading requirements. Jackson v. Bellsouth Telecomm., 372 F.3d 1250, 1262-63 (11th Cir. 2004) (citations omitted). Indeed, while "[s]pecific facts are not necessary[,]" the complaint should "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Further, the plaintiff must allege "enough facts to state a claim that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" Twombly, 550 U.S. at 555 (internal

quotations omitted); <u>see</u> <u>also</u> <u>Jackson</u>, 372 F.3d at 1262 (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal") (internal citation and quotations omitted). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" which simply "are not entitled to [an] assumption of truth." <u>See</u> <u>Iqbal</u>, 556 U.S. at 678, 680. Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[.]'" <u>Id.</u> at 678 (quoting <u>Twombly</u>, 550 U.S. at 570). And, while "[p]ro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed," <u>Tannenbaum v. United States</u>, 148 F.3d 1262, 1263 (11th Cir. 1998), "'this leniency does not give the court a license to serve as <u>de</u> <u>facto</u> counsel for a party or to rewrite an otherwise deficient pleading in order to sustain an action.'" <u>Alford v. Consol. Gov't of Columbus, Ga.</u>, 438 F. App'x 837, 839 (11th Cir. 2011)[5] (quoting <u>GJR Invs., Inc. v. Cty. of Escambia, Fla.</u>, 132 F.3d 1359, 1369 (11th Cir. 1998) (internal citation omitted), <u>overruled in part on other grounds as recognized in</u> <u>Randall</u>, 610 F.3d at 706).

---

[5] "Although an unpublished opinion is not binding . . . , it is persuasive authority." <u>United States v. Futrell</u>, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); <u>see</u> <u>generally</u> Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

## IV.    Eighth Amendment Standard

Pursuant to the Eighth Amendment of the United States Constitution, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). "To establish an Eighth Amendment violation, a prisoner must satisfy both an objective and subjective inquiry regarding a prison official's conduct." Oliver v. Fuhrman, 739 F. App'x 968, 969 (11th Cir. 2018) (citing Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004)). The Eleventh Circuit has explained:

> Under the objective component, a prisoner must allege a condition that is sufficiently serious to violate the Eighth Amendment. Id. The challenged condition must be extreme and must pose an unreasonable risk of serious damage to the prisoner's future health or safety. Id. The Eighth Amendment guarantees that prisoners are provided with a minimal civilized level of life's basic necessities. Id.

> Under the subjective component, a prisoner must allege that the prison official, at a minimum, acted with a state of mind that constituted deliberate indifference. Id. This means the prisoner must show that the prison officials: (1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and

> (3) displayed conduct that is more than mere negligence. Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003).

Id. at 969-70. "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." Whitley v. Albers, 475 U.S. 312, 319 (1986).

As it relates to medical care, "[t]he Supreme Court has interpreted the Eighth Amendment to prohibit 'deliberate indifference to serious medical needs of prisoners.'" Melton v. Abston, 841 F.3d 1207, 1220 (11th Cir. 2016) (quoting Estelle v. Gamble, 429 U.S. 97, 102 (1976)). The Eleventh circuit has explained that

> To prevail on a deliberate indifference claim, [a plaintiff] must show: "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir.2009). To establish deliberate indifference, [a plaintiff] must prove "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158 (11th Cir.2010) (alteration in original). The defendants must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and then actually draw that inference. Farrow v. West, 320 F.3d 1235, 1245 (11th Cir.2003) (quotation omitted).

Easley v. Dep't of Corr., 590 F. App'x 860, 868 (11th Cir. 2014). "For medical treatment to rise to the level of a constitutional violation, the care must be 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" Nimmons v. Aviles, 409 F. App'x 295, 297 (11th Cir. 2011) (quoting Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir.1991)); see also Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989) ("Grossly incompetent or inadequate care can constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment" or fail to respond to a known medical problem). However, the law is well settled that the Constitution is not implicated by the negligent acts of corrections officials and medical personnel. Daniels v. Williams, 474 U.S. 327, 330-31 (1986); Davidson v. Cannon, 474 U.S. 344, 348 (1986) ("As we held in Daniels, the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."). A complaint that a physician has been negligent "in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011) (quotation marks and citation omitted). Moreover, the Eleventh Circuit has noted that "[n]othing in our case law would derive a constitutional deprivation from a prison physician's failure to subordinate his own professional judgment to that of another doctor; to the contrary, it is well

established that 'a simple difference in medical opinion' does not constitute deliberate indifference." Bismark v. Fisher, 213 F. App'x 892, 897 (11th Cir. 2007) (quoting Waldrop, 871 F.2d at 1033). Similarly, "the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) (citation omitted).

## V. Exhaustion

The FDOC Defendants contend that Fox failed to properly exhaust his available administrative remedies. FDOC Motion at 4-11. Specifically, they contend that Fox "had no approved informal or formal grievances related to any claims against Defendants Inch, Mallard, or DeBell and was accordingly required to continue to the grievance appeal level to fully exhaust any claims." Id. at 10. While Fox filed multiple grievances related to the factual allegations he raises in the Complaint, the FDOC Defendants argue that "none of the claims or factual allegations raised in those grievances can be construed to be grieving claims against Defendants Inch, Mallard, or DeBell." Id. They acknowledge that Fox was not required to specifically name them in his grievances but contend that Fox "attributed all of his claims to other persons by name" and did not attribute any claims to them. Id. In response, Fox

contends that he did exhaust all his administrative remedies and notes that "if prison officials fail to respond in the amount of time stated on the form, the 'inmate' can treat that as a denial, and appeal immediately." Response at 9.

The Prison Litigation Reform Act (PLRA) requires an inmate wishing to challenge prison conditions to first exhaust all available administrative remedies before filing an action under 42 U.S.C. § 1983. See 42 U.S.C. § 1997e(a). Nevertheless, a prisoner is not required to plead exhaustion. See Jones v. Bock, 549 U.S. 199, 216 (2007). Instead, the United States Supreme Court has recognized "failure to exhaust is an affirmative defense under the PLRA[.]" Id. Notably, exhaustion of available administrative remedies is "a precondition to an adjudication on the merits" and is mandatory under the PLRA. Bryant v. Rich, 530 F.3d 1368, 1374 (11th Cir. 2008). Not only is there an exhaustion requirement, "the PLRA exhaustion requirement requires proper exhaustion." Woodford v. Ngo, 548 U.S. 81, 93 (2006).

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which "means using all steps that the agency holds out, and doing so properly (so

> that the agency addresses the issues on the merits)."
> Pozo,[6] 286 F.3d, at 1024. . . .

Woodford, 548 U.S. at 90. And, "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules . . . ." Id. As such, the United States Supreme Court has emphasized:

> Courts may not engraft an unwritten "special circumstances" exception onto the PLRA's exhaustion requirement. The only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are "available."

Ross v. Blake, 136 S.Ct. 1850, 1862 (2016).

The determination of whether an inmate exhausted his available administrative remedies prior to filing a cause of action in federal court is a matter of abatement and should be raised in a motion to dismiss or be treated as such if raised in a summary judgment motion. Bryant, 530 F.3d at 1374-75 (citation omitted). The Eleventh Circuit has explained the two-step process that the Court must employ when examining the issue of exhaustion of administrative remedies.

> After a prisoner has exhausted the grievance procedures, he may file suit under § 1983. In response to a prisoner suit, defendants may bring a motion to dismiss and raise as a defense the prisoner's failure to exhaust these administrative remedies. See Turner, 541 F.3d at 1081.[7] In Turner v. Burnside we

---

[6] Pozo v. McCaughtry, 286 F.3d 1022 (7th Cir. 2002).
[7] Turner v. Burnside, 541 F.3d 1077 (11th Cir. 2008).

established a two-step process for resolving motions to dismiss prisoner lawsuits for failure to exhaust. 541 F.3d at 1082. First, district courts look to the factual allegations in the motion to dismiss and those in the prisoner's response and accept the prisoner's view of the facts as true. The court should dismiss if the facts as stated by the prisoner show a failure to exhaust. Id. Second, if dismissal is not warranted on the prisoner's view of the facts, the court makes specific findings to resolve disputes of fact, and should dismiss if, based on those findings, defendants have shown a failure to exhaust. Id. at 1082–83; see also id. at 1082 (explaining that defendants bear the burden of showing a failure to exhaust).

Whatley v. Warden, Ware State Prison, 802 F.3d 1205, 1209 (11th Cir. 2015); see Pavao v. Sims, 679 F. App'x 819, 823-24 (11th Cir. 2017) (per curiam).

FDOC provides an internal grievance procedure for its inmates. See FLA. ADMIN. CODE r. 33-103.001 through 33-103.018. Generally, to properly exhaust administrative remedies, a prisoner must complete a three-step sequential process. First, an inmate must submit an informal grievance to a designated staff member at the institutional level. See FLA. ADMIN. CODE r. 33-103.005. If the issue is not resolved, the inmate must submit a formal grievance at the institutional level. See FLA. ADMIN. CODE r. 33-103.006. If the matter is not resolved at the institutional level, the inmate must file an appeal to the Office of the Secretary of the FDOC. See FLA. ADMIN. CODE r. 33-103.007. Notably, an inmate may bypass the informal grievance step if he

or she raises a medical grievance. See FLA. ADMIN. CODE r. 33.103.006(3)(e). An informal grievance must be received within twenty days of when the action being grieved occurred. See FLA. ADMIN. CODE r. 33-103.11(1)(a). If an informal grievance was not required, then the formal grievance must be received within fifteen days from the date on which the grieved action occurred. See FLA. ADMIN. CODE r 33-103.11(1)(b).

The FDOC Defendants acknowledge that Fox completed the grievance procedure but maintain that because his grievance did not raise any factual claims against them, the Court should not find exhaustion as to the claims against them. The FDOC Defendants have attached copies of Fox's grievances to their motion. Those records reflect that from the period of November 1, 2017, through December 31, 2019, Fox filed four grievances.[8] FDOC Ex. A at 1-2. On November 7, 2017, Fox wrote the assistant warden a grievance, in which he complained of not receiving his "life preserving (Factor 8) medication in a timely manner during a life[-]threatening emergency . . . ." Id. at 3. The life-threatening emergency in the grievance concerned the same November 4, 2017 events Fox describes in his Complaint. In the grievance, Fox took issue with one specific individual, McKenzie, and does not otherwise discuss or address any other Defendants. Id. As a remedy, Fox proposed that McKenzie be re-

_____

[8] Prison officials received Fox's grievances on December 18, 2017, January 23, 2019, August 23, 2019, and October 7, 2019. FDOC Ex. A at 1-2.

trained and an emergency procedure be created for the care of Fox's hemophilia. Id. In response, Negron and Woodard denied the grievance and advised Fox that FDOC policy requires the health services department to create emergency procedures for specific inmates, but that "[t]here is no such thing as an emergency dose of Factor 8 medication," particularly in light of the fact there is a wait time to take the medicine because it must be given at room temperature. Id. at 5. Additionally, they wrote that nurses cannot administer medication at his request regardless of his medical condition and that only a physician, physician assistant, or an ARNP can give an order to dispense Factor 8 medication in an amount greater than that which was currently prescribed. Id. The FDOC denied his appeal. Id. at 6-7.

On December 24, 2018, Fox filed a grievance concerning the prison staff's refusal to give him his scheduled Factor 8 infusion. Id. at 8. According to this grievance, Fox showed up on Monday December 24, 2018, to get his scheduled Factor 8 infusion, but after waiting awhile, was told the infusion was rescheduled for Wednesday. Id. Fox told medical staff that he was experiencing bleeding within his left and right ankle and needed the medication that day. Id. However, they still told him to wait until Wednesday. Id. Fox did not specifically name any individual in his grievance. Id. The response to the grievance concluded that records showed Fox had requested an additional dose of the Factor 8 medication that Fox felt he needed because of ankle pain and

swelling, and that Fox did not miss a scheduled dose. Id. at 9. As such, the prison staff found the care Fox received was appropriate and denied the grievance. Id. Fox appealed, id. at 10, but the appeal was denied, id. at 11.

Fox submitted a third grievance on August 15, 2019. Id. at 12. In this grievance, he complained that his port-a-cath was bleeding, infected, and had become exposed. Id. After being taken to an outside hospital, the port-a-cath had to be removed. Id. According to Fox, this issue was directly related to "Ms. Barnett's continual refusal to access or maintain proper care of my port," as well as Montoya's refusal to schedule the removal of the port-a-cath months earlier and the entire medical staff at RMC because they ignored his complaints. Id. Prison staff found this grievance did not comply with the procedures and informed Fox he must first submit the grievance at the appropriate level at his correctional institution. Id. at 13. Fox appealed to the Secretary of FDOC, id. at 14, who ultimately returned the appeal without action, id. at 15.

The first step of the Turner analysis requires this Court to accept as true Fox's factual allegations provided in his response and determine whether dismissal is appropriate based on the facts as Fox alleges. Whatley, 802 F.3d at 1209. Although Fox alleges that he properly exhausted his claims, he offers no factual allegations in support. As such, the Court turns to the second step of the Turner analysis. At this stage, the Court must make "specific findings to

resolve disputes of fact, and should dismiss if, based on those findings, defendants have shown a failure to exhaust." <u>Whatley</u>, 802 F.3d at 1209.

Under the PLRA's exhaustion requirement, "exhaustion is not <u>per se</u> inadequate simply because an individual later sued was not named in the grievances." <u>Jones</u>, 549 U.S. at 219. Indeed, "[s]ection 1997e(a)'s exhaustion requirement is designed 'to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued . . . .'" <u>Parzyck v. Prison Health Servs., Inc.</u>, 627 F.3d 1215, 1219 (11th Cir. 2010) (quoting <u>Jones</u>, 549 U.S. at 219). In the Complaint, Fox's allegation revolve around two incidents in which he claims he was not given emergency doses of his Factor 8 medication and a claim regarding the state and lack of use of his port-a-cath. Accordingly, as the factual allegations in Complaint were generally grieved, Fox's failure to name the FDOC Defendants is not fatal. The allegations in Fox's grievances alerted prison officials of the issues addressed in his Complaint. Analyzing the parties' grievances in relation to the grievances provided to the Court, the Court finds that Fox exhausted the claims against the FDOC Defendants.

## VI.    Fourteenth Amendment Claims

In addition to the Eighth Amendment claims, Fox attempts to assert a § 1983 claim against Defendants for violating his right to due process guaranteed by the Fourteenth Amendment. Because this claim fails as a

matter of law, the Court addresses it here before turning to the merits of his Eighth Amendment deliberate indifferent and state law claims. The FDOC Defendants, Nurses, Bassa, and Negron contend that Fox has failed to allege the existence of a due process violation. FDOC Motion at 13-15; Nurses Motion at 13; Bassa Motion at 12; Negron Motion at 6-7. Additionally, to the extent Fox sues under the Fourteenth Amendment to address his conditions of confinement, such claims are subsumed into Fox's Eighth Amendment claim. FDOC Motion at 13-15; Nurses Motion at 13; Bassa Motion at 12; Negron Motion at 6-7. Upon review of the Complaint, the Court agrees. The only allegation in the Complaint that could be liberally construed as asserting a due process violation is Fox's complaint regarding his grievances. However, "prisoners have no constitutionally protected liberty interest in having access to prison grievance procedures." Allen v. Sec'y, Fla. Dep't of Corr., 578 F. App'x 836, 839 (11th Cir. 2014) (citing Bingham, 654 F.3d at 1177). As Fox does not have a constitutionally protected liberty interest in the grievance process, he has failed to state a claim upon which relief can be granted in a § 1983 suit. See id.; Gross v. Jones, No. 3:18-CV-594-J-39PDB, 2018 WL 2416236, at *4 (M.D. Fla. May 29, 2018) ("The denial of a prison grievance does not amount to a federal constitutional violation under § 1983.").

The Court also finds that to the extent Fox argues the deficiencies in his medical care violated the Fourteenth Amendment, such claims are properly

brought under the Eighth Amendment because he is a prisoner and not a civil detainee. See Bilal v. Geo Care, LLC, 981 F.3d 903, 915 (11th Cir. 2020) (recognizing that conditions of confinement claims brought by civil detainees are analyzed under the Fourteenth Amendment and those brought by criminal prisoners are analyzed under the Eighth Amendment). Accordingly, Fox's Fourteenth Amendment Claims are due to be dismissed.

## VII. Eighth Amendment Claims

### A. FDOC Motion

The FDOC Defendants contend that Fox fails to state a claim upon which relief can be granted. FDOC Motion at 12-15. According to FDOC Defendants, Fox's allegations against them are premised on their supervisory roles, and he has not alleged they personally participated in the alleged violations. Id. 12-13. As such, they are not liable. Id. To the extent Fox asserts claims based on the denial of grievances or a failure to investigate, they allege such claims are not cognizable under § 1983. Id. at 13-15. In the Response, Fox contends that the FDOC Defendants had a duty to make sure their staff was well trained. Response at 5-6. Fox maintains that the FDOC Defendants authorized or knowingly acquiesced to the violations of his Eighth Amendment rights "[t]hrough the Inmate Grievance Procedure." Id. at 6.

The Eleventh Circuit has explained:

"Supervisory officials are not liable under section 1983 on the basis of respondeat superior or vicarious liability." Belcher v. City of Foley, Ala., 30 F.3d 1390, 1396 (11th Cir. 1994) (internal quotation marks and citation omitted). "The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." Gonzalez, 325 F.3d at 1234 (internal quotation marks and citation omitted).[9] "Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official  and the alleged constitutional deprivation." Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990).

"The necessary causal connection can be established 'when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.'" Cottone, 326 F.3d at 1360 (citation omitted).[10] "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." Brown, 906 F.2d at 671. A plaintiff can also establish the necessary causal connection by showing "facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so," Gonzalez, 325 F.3d at 1235, or that a supervisor's "custom or policy . . . resulted in deliberate indifference to constitutional rights," Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991).

Danley v. Allen, 540 F.3d 1298, 1314 (11th Cir. 2008) (overruled on other grounds as recognized by Randall v. Scott, 610 F.3d 701, 709 (11th Cir. 2010)

---

[9] Gonzalez v. Reno, 325 F.3d 1228 (11th Cir. 2003).
[10] Cottone v. Jenne, 326 F.3d 1352 (11th Cir. 2003).

(rejecting the application of a heightened pleading standard for § 1983 cases involving qualified immunity)); see also Keith v. DeKalb Cty., Ga., 749 F.3d 1034, 1047-48 (11th Cir. 2014). In sum,

> To state a claim against a supervisory defendant, the plaintiff must allege (1) the supervisor's personal involvement in the violation of his constitutional rights,[11] (2) the existence of a custom or policy that resulted in deliberate indifference to the plaintiff's constitutional rights,[12] (3) facts supporting an inference that the supervisor directed the unlawful action or knowingly failed to prevent it,[13] or (4) a history of widespread abuse that put the supervisor on notice of an alleged deprivation that he then failed to correct. See id. at 1328–29 (listing factors in context of summary judgment).[14] A supervisor cannot be held liable under § 1983 for mere negligence in the training or supervision of his employees. Greason v. Kemp, 891 F.2d 829, 836–37 (11th Cir. 1990).

Barr v. Gee, 437 F. App'x 865, 875 (11th Cir. 2011) (per curiam). Here, any supervisory claims fail because Fox has not alleged any facts suggesting that Defendants were personally involved in, or otherwise causally connected to, any alleged violations of his federal statutory or constitutional rights.

---

[11] See Goebert v. Lee Cty., 510 F.3d 1312, 1327 (11th Cir. 2007) ("Causation, of course, can be shown by personal participation in the constitutional violation.").

[12] See Goebert, 510 F.3d at 1332 ("Our decisions establish that supervisory liability for deliberate indifference based on the implementation of a facially constitutional policy requires the plaintiff to show that the defendant had actual or constructive notice of a flagrant, persistent pattern of violations.").

[13] See Douglas v. Yates, 535 F.3d 1316, 1322 (11th Cir. 2008) ("Douglas's complaint alleges that his family informed [Assistant Warden] Yates of ongoing misconduct by Yates's subordinates and Yates failed to stop the misconduct. These allegations allow a reasonable inference that Yates knew that the subordinates would continue to engage in unconstitutional misconduct but failed to stop them from doing so.").

[14] West v. Tillman, 496 F.3d 1321 (11th Cir. 2007).

In the Complaint, Fox alleges that DeBell signed a response to his medical grievance, #1712-307-054, in which Fox took issue with Negron. Complaint at 12. Fox additionally claims that DeBell was aware Fox was "a severe hemophiliac A patient, and that the situation which I was badly hurt was possible for me to be deadly." Id. According to Fox, DeBell refused to provide proper medical care through DeBell's denial of Fox's grievance. Id. Fox contends that FDOC policies did not meet his severe medical needs. Id. Specifically, he takes issues with prison staff's failure to create a personalized emergency procedure for his hemophilia despite the fact that FDOC policy authorizes the creation of such inmate-specific protocols. Id. Fox does not make any allegations against Mallard or Inch specifically.

Fox has not alleged Mallard or Inch directly participated in the alleged constitutional violations. And although Fox alleges DeBell was personally aware of the alleged serious medical risk but still denied Fox's grievance, the denial of his grievance does not violate the Constitution. See Allen, 578 F. App'x at 839 Gross, No. 3:18-CV-594-J-39PDB, 2018 WL 2416236, at *4. Moreover, DeBell's review of the grievance does not amount to a direct participation in the alleged failure to administer emergency doses of Factor 8 medication or the care for Fox's port-a-cath. See Williams v. Limestone Cty., Ala., 198 F. App'x 893, 897 (11th Cir. 2006) ("[S]upervisory officials are entitled to rely on medical judgments made by medical professionals responsible for

prisoner care."); <u>Gallagher v. Shelton</u>, 587 F.3d 1063, 1069 (10th Cir. 2009) ("a denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983."). Notably, as Fox recognizes in the Complaint, the FDOC actually had a policy that allowed for the creation of emergency medical procedures for specific inmates. The FDOC Defendants' alleged failure to create a specialized emergency protocol for Fox does not amount to a constitutional violation where they were entitled to rely on the medical judgment of the medical professionals responsible for Fox's care. <u>See</u> <u>id.</u> As such, Fox has failed to allege that the FDOC Defendants directly participated in the alleged violations.

Lacking allegations that the FDOC Defendants directly participated in the alleged violations, Fox must show a causal connection exists between the FDOC Defendants actions and the alleged constitutional violations in order to state a viable § 1983 claims against the FDOC Defendants in their individual capacities. Here, however, Fox has not alleged a history of widespread abuse concerning the care for hemophiliacs generally, nor has he alleged the existence of a custom or policy that resulted in the alleged constitutional violations. Indeed, he readily admits FDOC has a policy in place to allow for inmate-specific emergency procedures. Additionally, in the Complaint Fox makes no factual allegations that the FDOC Defendants directed their

employees to act unlawfully or failed to correct employees who they knew were acting unlawfully. See Williams, 198 F. App'x at 897; Gallagher, 587 F.3d at 1069. In light of the above analysis, Fox has failed to state a claim for relief under the Eighth Amendment against the FDOC Defendants. Therefore, the FDOC Motion is due to be granted on this issue.[15]

## B.    Nurses, Bassa, and Negron Motions

The Nurses, Bassa, and Negron contend that they are entitled to qualified immunity. Nurses Motion at 22-24; Bassa Motion at 22-23; Negron Motion at 27-29. The Nurses argue that Fox has failed to allege an Eighth Amendment violation against them and, even if he had, they are entitled to dismissal with prejudice because Fox cannot meet his burden of demonstrating that under these facts that the Nurses violated a clearly established right. Nurses Motion at 22-24. According to Bassa, Fox's allegations only demonstrate that Fox disagreed with Bassa's medical judgment, not that he was deliberately indifferent to Fox's swollen ankle. Bassa Motion at 22-23. Bassa maintains that deferring the shot for one day, without more, is

---

[15] As the FDOC Defendants are due to be dismissed for Fox's failure to state a claim upon which relief can be granted, the Court need not address the FDOC Defendant's alternative arguments. However, the Court notes given Florida's decision to not waive Eleventh Amendment Immunity in civil rights cases; see Gamble v. Fla. Dept. of Health and Rehab. Services, 779 F.2d 1509, 1520 (11th Cir. 1986); the Eleventh Amendment would bar Fox from recovering monetary damages from the FDOC Defendants in their official capacities, see Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs., 225 F.3d 1208, 1220 (11th Cir. 2000).

insufficient to establish that Bassa had a subjective awareness of a risk of serious harm. Id. Negron asserts that he is entitled to qualified immunity because there is no authority clearly establishing that Negron's conduct violated the Eighth Amendment. Negron Motion at 27-29. In response, it appears Fox is arguing that Defendants are bound by FDOC rules and regulations and knew their actions violated these rules; therefore, qualified immunity does not attach. Response at 10.

The Court notes that although "the defense of qualified immunity is typically addressed at the summary judgment stage of a case, it may be . . . raised and considered on a motion to dismiss." St. George v. Pinellas Cty., 285 F.3d 1334, 1337 (11th Cir. 2002). "Generally speaking, it is proper to grant a motion to dismiss on qualified immunity grounds when the 'complaint fails to allege the violation of a clearly established constitutional right.'" Corbitt v. Vickers, 929 F.3d 1304, 1311 (11th Cir. 2019) (quoting St. George, 285 F.3d at 1337). The Eleventh Circuit has stated:

> The qualified-immunity defense reflects an effort to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The doctrine resolves this balance by protecting government officials engaged in discretionary functions and sued in their individual capacities unless they violate "clearly established federal statutory or constitutional rights of which a

reasonable person would have known." <u>Keating v. City of Miami</u>, 598 F.3d 753, 762 (11th Cir. 2010) (quotation marks and brackets omitted).

As a result, qualified immunity shields from liability "all but the plainly incompetent or one who is knowingly violating the federal law." <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002). But the doctrine's protections do not extend to one who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 815 (1982) (internal quotation marks and alteration omitted).

To invoke qualified immunity, a public official must first demonstrate that he was acting within the scope of his or her discretionary authority. <u>Maddox v. Stephens</u>, 727 F.3d 1109, 1120 (11th Cir. 2013). As we have explained the term "discretionary authority," it "include[s] all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." <u>Jordan v. Doe</u>, 38 F.3d 1559, 1566 (11th Cir. 1994) (internal quotation marks omitted). Here, it is clear that Defendant Officers satisfied this requirement, as they engaged in all of the challenged actions while on duty as police officers conducting investigative and seizure functions.

Because Defendant Officers have established that they were acting within the scope of their discretionary authority, the burden shifts to [the plaintiff] to demonstrate that qualified immunity is inappropriate. <u>See</u> <u>id.</u> To do that, [the plaintiff] must show that, when viewed in the light most favorable to him, the facts demonstrate that Defendant Officers violated [Plaintiff's] constitutional right and that that right was "clearly established ... in light of the specific context of the case, not as a broad general proposition[,]" at the time of Defendant officers'

> actions. <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), <u>overruled</u> <u>in</u> <u>part</u> <u>on</u> <u>other</u> <u>grounds</u> by <u>Pearson</u>, 555 U.S. 223, 129 S.Ct. 808. We may decide these issues in either order, but, to survive a qualified-immunity defense, [the plaintiff] must satisfy both showings. <u>Maddox</u>, 727 F.3d at 1120–21 (citation omitted).

<u>Jones v. Fransen</u>, 857 F.3d 843, 850-51 (11th Cir. 2017). The Court notes that where the alleged conditions are particularly egregious, a general constitutional law already identified in decisional law may be applicable such that a reasonable officer would know that the egregious conditions violate the Constitution. <u>Taylor v. Riojas</u>, No. 19-1261, 2020 WL 6385693, at *1 (U.S. Nov. 2, 2020).

The allegations in the Complaint establish that the Nurses, Bassa, and Negron were acting within the scope of their discretionary authority. Accordingly, the burden shifts to Fox to demonstrate that qualified immunity is inappropriate. In the Complaint, Fox alleges the Nurses failed to administer his Factor 8 medication via the port-a-cath designed for that purpose despite the fact doctors had given the Nurses the authorization to use the port. Fox maintains that the Nurses were told they could use the port and he personally informed them that giving him the medication intravenously caused him pain, but yet they still refused to administer the medication via the port-a-cath. Their refusal to use the port-a-cath allegedly led to it getting infected and ultimately being removed. Fox has failed to carry his burden to establish that

the Nurses are not entitled to qualified immunity. The Court is aware of no authority finding that administering medicine through a vein instead of a port-a-cath violates the Eighth Amendment. Indeed, here, the Nurses were not deliberately indifferent to Fox's hemophilia because they in fact treated him with medication. A challenge to the Nurses' decision to give Fox his medication intravenously instead of through the port-a-cath amounts to a disagreement over how treatment is administered, which is insufficient to state a claim of an Eighth Amendment violation. At best, Fox has alleged the Nurses acted negligently; however, this too is insufficient to establish a constitutional violation. Accordingly, the Court finds that the Nurses are entitled to qualified immunity and their motion is due to be granted.

The Court also finds that Bassa is entitled to qualified immunity because Fox does not allege sufficient facts to establish Bassa was deliberately indifferent to Fox's swollen ankle and hemophilia. Fox alleges that Bassa believed Fox would be fine and his condition was best treated by the oncology department, which Fox could (and did) access the next day. These allegations show nothing more than that Fox disagreed with Bassa's medical judgment, which is, at best, a negligence claim that cannot support an Eighth Amendment violation. Accordingly, the Court finds the Bassa Motion is due to be granted on this matter and Bassa is entitled to qualified immunity.

Regarding Negron, in the Complaint, Fox alleges Negron "never corrected any of the life-threatnings [sic] wrongs committed by nurse McKenzie, though he knew about my severe medical needs and medical condition." Complaint at 11. Fox also challenges Negron's assertion that emergency doses of Factor 8 medication do not exist. Id. at 12. Fox asserts that Negron was aware he was a severe hemophiliac patient and that situations in which Fox is badly injured can turn deadly due to his disease. Id. Yet, according to Fox, Negron, among others, refused to give him proper medical care and failed to create an emergency protocol for Fox despite Fox being at Sumter for ten years. Id.

As the Court previously discussed, to hold a defendant liable in a supervisory role, a plaintiff must show "that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation." Keith, 749 F.3d at 1047-48. Fox does not allege that Negron directly participated in the alleged unconstitutional conduct as he never states that Negron was present when he needed an alleged emergency dose of Factor 8 medication or when his port-a-cath was not being used. Fox has not alleged a history of widespread abuse or the existence of a custom or policy created by Negron that resulted in the deliberate indifference to his serious medical need. Additionally, Fox has not alleged facts to support an inference that Negron

directed subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to correct them. As the Court concluded above, the alleged failure to administer an emergency dose of Factor 8 medication and the lack of use of Fox's port-a-cath do not establish Eighth Amendment violations. Therefore, because Fox's allegations against Negron are based on his failure to supervise these aspects of his medical care, Fox has failed to establish an Eighth Amendment violation against Negron. In light of the above, the Negron Motion is due to be granted as to this issue.

## VIII.     Claims Against O. McKenzie

Service of process was returned unexecuted on McKenzie because "no nurse by the name O. McKenzie work[s] for Reception & Medical Center" (Doc. 22). On July 13, 2020, and July 14, 2020, counsel entered appearances on behalf of Defendant McKenzie (Docs. 28, 30), but did not respond to the Complaint. Therefore, on September 3, 2020, the Court directed counsel to provide the Court with either (1) the current place of employment or last known address for Defendant McKenzie, if available, or (2) whether he waives service of the summons and the complaint (Doc. 39). On October 9, 2020, counsel provided a last known address of Centurion of Florida, LLC's former employee "Orville N. McKenzie" (Doc. 46) and based on that information the Court redirected service of process (Doc. 49). Service of process was again

returned unexecuted on Defendant McKenzie because "he has moved to NY" (Docs. S-56, 57).

On December 14, 2020, the Court directed the U.S. Marshal to use reasonable efforts in an attempt to locate and perfect service on Defendant McKenzie (Doc. 58). Service of process was again returned unexecuted on Defendant "Orville N. McKenzie" because the Deputy U.S. Marshal indicates "no address in NY for Orville N. McKenzie," but state "[t]here is an address in NY for Orville D. McKenzie." (Docs. S-59, 60). The Court requested counsel for Defendant McKenzie to file a notice clarifying the middle initial of Defendant O. McKenzie (Doc. 61). Counsel complied confirming "Defendant Orville McKenzie's middle initial is N" (Doc. 65).

On January 25, 2021, the Court directed Fox to show cause by March 1, 2021, why McKenzie should not be dismissed from this action. See Order to Show Cause (Doc. 66). On February 22, 2021, Fox filed a response alleging McKenzie is attempting to avoid suit and Centurion of Florida, LLC is knowingly withholding information concerning the location of McKenzie, and further asks that McKenzie remain as a Defendant in this action (Doc. 69). However, Fox did not provide substantial additional identifying information to assist in the service of process on McKenzie.

In consideration of the foregoing, the Court finds reasonable efforts to locate McKenzie have been exhausted. Therefore, McKenzie is due to be dismissed without prejudice as a Defendant in this action.

## IX.    State Law Claims

Because all of Fox's federal claims are due to be dismissed, the Court declines to exercise supplemental jurisdiction over his pendant state claims. See Raney v. Allstate Ins. Co., 370 F.3d 1086, 1088-89 (11th Cir. 2004) (noting that districts courts are encouraged "to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial."). Accordingly, Fox's tort claims sounding in Florida law are due to be dismissed.

In light of the above, it is

**ORDERED**:

1)    FDOC's Motion to Dismiss (Doc. 41) is **GRANTED** to the extent that all claims against J. Debell, Elizabeth Mallard, and Mark S. Inch are dismissed.

2)    Nurses' Motion to Dismiss (Doc. 43) is **GRANTED** to the extent that all claims against Lacey Barnett and Megan Perry are dismissed.

3)    Bassa's Motion to Dismiss (Doc. 44) is **GRANTED** to the extent that all claims against Bassa are dismissed.

4)    Negron's Motion to Dismiss (Doc. 62) is **GRANTED** to the extent that all claims against A. Negron are dismissed.

5)     The claims against O. McKenzie are **DISMISSED without prejudice**.

6)     This action is **DISMISSED**.

7)     The **Clerk** shall enter judgment dismissing this case, terminate any pending motions, and close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this 5th day of May, 2021.


**MARCIA MORALES HOWARD**
United States District Judge


Jax-8

C:     Nathan G. Fox #R50090
       Counsel of record